IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 31, 2013

IN RE JOSEPH G. ET AL.

**Appeal from the Juvenile Court for Hancock County**
**No. J1170     Floyd W. Rhea, Judge**

_____

**No. E2012-2501-COA-R3-PT-FILED-JULY 31, 2013**

_____

This is a termination of parental rights case focusing on Joseph G., Trinity G., and Stephen G. ("the Children"), the minor children of a married couple, J.G. ("Father") and E.G. ("Mother"). The Children, then ages four, two and one respectively, were placed in the protective custody of the Department of Children's Services ("DCS") following the incarceration of both parents. The Children were subsequently adjudicated dependent and neglected by stipulation of the parents. A year after the Children entered foster care, DCS filed suit to terminate the parents' rights. Following a bench trial, the court granted DCS's petition. The trial court found, by clear and convincing evidence, that multiple grounds for termination exist as to both parents and that termination is in the Children's best interest. Father and Mother separately appeal. As to both parents, we reverse the trial court's finding of willful failure to support. In all other respects, the judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Reversed in Part; Termination of Both Parents' Parental**
**Rights Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Aaron J. Chapman, Morristown, Tennessee, for the appellant, J.G.

William E. Phillips, II, Rogersville, Tennessee, for the appellant, E.G.

Robert E. Cooper, Jr., Attorney General and Reporter, and Mary Byrd Ferrara, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Deborah A. Yeomans, Johnson City, Tennessee, Guardian ad Litem.

**OPINION**

I.

DCS first became involved with the family in August 2010. Police responded to a report that no one was home to meet Joseph when he arrived from kindergarten. Upon investigation, the police also found that the two younger children, Trinity and Stephen, had been left unsupervised. When Mother arrived home, she was arrested for public intoxication. By Mother's account, she was at home but had fallen asleep. She denied that she was "high," but admitted to failing a sobriety test. Father was not present at the scene; at the time, he was subject to a restraining order that Mother had taken out stemming from a 2009 domestic assault. DCS took the Children into protective custody. They were returned to Mother the following month when DCS's petition for temporary custody was dismissed because of DCS's failure to timely pursue it. DCS established a non-custodial permanency plan for the Children. It began making efforts to assist Mother. Mother did not comply with the plan or follow any of DCS's recommendations.

On December 19, 2010, Mother and Father were incarcerated. Mother had been arrested on a charge of theft over $1,000 and for failure to appear. Father, who had been free on bond, was arrested for a probation violation and failure to appear. Initially, the Children were placed in the emergency custody of their maternal grandmother, L.F. ("Grandmother"). After a few days, she returned them to DCS custody, stating she was unable to care for them at her current residence. DCS filed another petition for temporary custody on December 22, 2010. The petition alleged that the Children were dependent and neglected and in need of a proper guardian. The trial court granted the petition and the Children entered foster care. The Children were twice moved before settling into their third and current foster home placement in March 2011.

In January 2011, the non-custodial plan became the "family permanency plan." The plan's stated goal was the return of the Children to the parents. The plan generally charged the parents with providing an environment "without domestic violence, drug abuse and public intoxication concerns." DCS went over the plan with Mother and Father and they signed it.[1] Among their responsibilities, the parents were required to enroll in domestic violence classes and seek marital counseling; complete anger management classes; complete alcohol and drug assessments; follow all recommendations following the assessments;

---

[1]Father was in jail at the time; the case manager personally delivered the plan to Father there and reviewed it with him "line by line," after which he signed it.

complete parenting classes; submit to hair follicle drug tests; pass all drug screens; and "present themselves in a sober fashion." Further, they were directed to obtain and maintain suitable housing, complete therapeutic visitations with the Children, pay child support and provide gifts and clothing for the Children.

On February 1, 2011, by an agreed order, the Children were adjudicated as being dependent and neglected. Father was released on bond in March 2011, but he returned to jail in May to serve 270 days after he again violated his probation, for the fourth time. In interactions with the parents, the DCS case manager, Patricia Johnson, repeatedly observed that Mother was intoxicated – at the DCS office, on the street, and when Mother arrived for a parenting assessment. Mother seemed to doze off at DCS meetings and court hearings. When questioned, Mother told Ms. Johnson that she was taking Suboxone, a drug that, according to Mother, allowed her to consume alcohol without her consumption being detected on any "flipping test" she might be required to take. Mother denied ever being intoxicated around her case manager, but admitted to taking sleeping pills. At an agency meeting in August 2011, DCS staff determined that the parents had made no discernable progress toward regaining custody. As a consequence, DCS decided to proceed with a suit to terminate. At the same time, they gave Mother and Father more time to see if they would follow through with their stated intention to make some progress in completing the "action steps" outlined in the permanency plan.

By December 2011, DCS had filed a revised permanency plan that changed the goal of the plan to adoption. DCS noted that Mother and Father had failed to complete any of the plan's goals looking toward a restoration of custody. DCS pointed out that the parents made no real effort on the permanency plan until after termination proceedings were initiated.

The trial court ordered no further contact between the parents and the Children based on allegations that the visits were too upsetting to the Children. On December 19, 2011, DCS filed a petition to terminate the parents' parental rights. The petition asserted multiple grounds against each parent for termination, including abandonment, non-compliance with the permanency plan, and persistence of conditions. Trial was held in September 2012. Joseph was then seven, Trinity was five and Stephen was four.

The proof showed that the parents led troubled lives before and after losing custody. Both had criminal histories that dated back several years. After Mother and Father went to jail and the Children were removed, the parents had no stable housing or employment. During most of 2011, Father was incarcerated. At other times, Mother and Father moved around, lived with others, or stayed in a motel room. In March 2011, Mother was involved in a serious car accident. At the time, she was already taking prescription pain medication. The dosages were increased when the Children were removed. Mother said between May

and July 2011, she stopped going to a pain clinic and tried to wean herself off the drugs in an effort to regain custody. The record reflects, however, that in May 2011, she was dismissed from the clinic as a result of using different names to obtain narcotics from different pharmacies. Mother admittedly regressed. In September 2011, she took Suboxone prescribed for someone else. Mother did not have her driver's license reinstated or a car until the end of December 2011. By then, contact with the Children had been prohibited and Mother did nothing for the next three months. She "just stayed home."

Mother acknowledged she did not satisfy the requirements of the permanency plan; she said she had tried. She explained that, for the most part, she raised the Children alone because Father was either away working or in jail. When Father was in jail, Mother supported the family with welfare and/or food stamps if she was not doing odd jobs. She said she always did her best for the Children, even when they lost Father's income and the family had to move because there was no money to pay the rent. Mother said the Children "always had a roof over [their] heads, food . . . and been nice and warm and clean and loved."

Father made some progress – he incurred no new criminal charges following his release from jail in October 2011; and he had completed a parenting assessment while in jail. Father visited the Children when he was released on bond, but agreed that during the same time he did not obtain a home, job, or transportation. Father agreed that the case manager had attempted to help him and acknowledged that he failed to undergo a hair follicle drug test, attend anger management or parenting classes, did not secure stable housing, and failed to attend the Children's appointments before the termination petition was filed. At trial, he testified he was working doing odd jobs on a cattle farm. He also said that he expected to have his driver's license reinstated.

Mother testified that, at the time of trial, she was working for her grandmother and earned $160 a week. Before the petition was filed, she briefly worked at McDonald's and said child support was deducted from her checks. She also worked at other odd jobs. She testified that, in May 2012, she sent $300 to the offices of child support enforcement services through her mother. She testified she could take care of the Children now. She and Father testified that, since approximately January 2012, they were living in a trailer that they had purchased. It was located on Grandmother's property.

According to the DCS's Ms. Johnson, the Children had "flourished" in their current foster home in the six months before trial. On the other hand, she stated that the parents had made no obvious changes in circumstances or conduct such as would allow the Children to return safely to their care. In the Spring of 2012, Father had ceased any contact with DCS. The case manager only saw Mother when she appeared in court on other matters. At no time

-4-

following the Children's removal from Mother's care had she asked about the Children's well-being. Father only inquired about them very early in the process.

The trial court found that there was clear and convincing evidence to establish the same multiple grounds with respect to termination of each parent's rights. More specifically, the court found: (1) abandonment – by willful failure to visit or support, by conduct evincing a wanton disregard for the Children's welfare, and by the parents' failure to provide a suitable home; (2) substantial noncompliance with a permanency plan, and (3) persistence of conditions. The court further found there is clear and convincing evidence that termination of both parents' rights is in the best interest of the Children. Mother and Father, represented by separate counsel, each filed a timely notice of appeal.

## II.

The following issues are raised:

1. The trial court erred in finding that there was clear and convincing evidence to establish multiple forms of abandonment

2. The trial court erred in finding that there was clear and convincing evidence to establish substantial noncompliance with a permanency plan.

3. The trial court erred in finding that there was clear and convincing evidence to establish that the conditions which led to the Children's removal still persisted.

4. The trial court erred in finding, by clear and convincing evidence, that termination of Mother's rights was in the best interest of the Children.

5. The trial court made evidentiary errors in admitting Collective Exhibit #1 into evidence and by relying on said exhibit in its findings of fact.

6. The trial court erred in admitting testimony that an email from an employee of the District Attorney's Office showed a failure of the [parents] to pay child support.

## III.

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's determinations of witness credibility, which shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002).

As this Court has observed:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S*., E2011-00517-COA-R3-PT, 2011 WL 4553233 (Tenn. Ct. App. E.S., filed Oct. 4, 2011)(citations omitted).

## IV.

First, we address the parents' evidentiary issues. Mother challenges the trial court's admission of Collective Exhibit 1, entitled "DCS Notebook" on hearsay grounds. Generally summarized, Exhibit 1 consists of all of the documents compiled by the case manager in support of DCS's case. The exhibit begins with copies of the Children's birth certificates

and includes photos; the permanency plans; court orders, petitions, motions and affidavits of reasonable efforts; service of process; the putative father registry; and TFACTS[2] reports. In a related issue, both Mother and Father specifically challenge the admissibility of an email from a person responding to the case manager's inquiry concerning child support.

Mother asserts that allowing Exhibit 1, a massive compilation of assorted documents, into evidence as a collective exhibit prevented her from challenging the veracity or reliability of any one document. She complains that some of the reports and other documents were not generated by DCS, only *collected by* it. At trial, counsel for Mother and Father essentially objected to Exhibit 1 as follows:

> Mr. Chapman [for Father]: [F]irst issue that was addressed was that that's a business record exception. That doesn't include, . . . double, triple, quadruple hearsay, so and so said that such and such showed up for her assessment and that such and such said that so and so said she had this issue going on, all that type of stuff does not qualify under business records. If it's relevant and if it needs to be brought in, it needs to be brought in individually. We can't admit 600 pages of other people's statements and uncertified Court records.

> Mr. Guinn [for DCS]: Then counsel needs to make a specific objection . . .

> \* \* \*

> Mr. Chapman: The notebook is objected to.

> Mr. Guinn: Bring out the documents you object to and the portion of the documents you object to?

> Mr. Phillips [for Mother]: We're not the ones introducing it.

> \* \* \*

> The Court: If you'll go item by item what's in the table of contents then I'll rule on what can be collectively introduced.

---

[2]TFACTS is an acronym for Tennessee Family and Child Tracking System.

\* \* \*

> [T]he witness has testified that these are all business records maintained by her in her course of the case management for these three children and you'll have ample opportunity to cross examine[] her. And it, for efficiency the Collective Exhibit is probably the best way to go. . . . So, and you're welcome to cross examine her on any document that is introduced. . . .

Tenn. R. Evid. 803(6) provides a hearsay exception for "business records" as follows:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

The Advisory Commission comments state:

> This rule essentially is the same as the Uniform Business Records as Evidence Act, Tenn. Code Ann. § 24-7-111 [since repealed]. To avoid interpretive mistakes such as that in Wheeler v. Cain, 62 Tenn. App. 126, 459 S.W.2d 618 (1970), the proposal specifically requires that the declarant have "a business duty to record or transmit" information. Without that duty, a business record would lack the trustworthiness necessary to carve out a hearsay exception.

As DCS correctly submits, Ms. Johnson of DCS laid the proper foundation for the introduction of Exhibit 1. She testified that the documents therein were generated or compiled by her in the course of her management of the Children's custody case in her

capacity as their DCS case manager. As to the objection to the admission of Exhibit 1 as a collective exhibit, we conclude that there was no error.

Subsequently, counsel for Mother objected to a specific document contained in Exhibit 1 as hearsay. More specifically, in her testimony, Ms. Johnson relied on an email she received from a "Rose Sauls" regarding child support payments by Mother and Father. The email at issue was in response to an inquiry Ms. Johnson sent to Ms. Sauls as follows:

> From: Patricia C. Johnson
> Sent: Friday, January 27, 2012
> To: Rose Sauls
> Subject: [G.] CASE
>
> I have filed TPR on the case of [Father and Mother] over in Hancock, I had mailed the court order earlier.
>
> I just need to know if the family [J.G.] . . . or [E.G.] . . . had paid any child support and or has any court dates for child support.

The responsive email is as follows:

> RE: [G.] CASE
> Rose Sauls
> Sent: Friday, February 03, 2012
> To: Patricia C. Johnson
>
> [E.G.] has paid nothing and her cases are set for Court to Show Cause on 4/19/12. [J.G.] just started paying this month.

During Ms. Johnson's direct testimony, counsel for Mother objected as follows:

> Mr. Guinn: And how many payments of child support did [Mother] make . . . .?
>
> Ms. Johnson: Per my record that I received from child support as of . . .
>
> Mr. Phillips: Judge . . .

Ms. Johnson: . . . the month of December when I filed [the petition], it was none.

Mr. Phillips: It's hearsay.

The Court: It's a business record.

\* \* \*

Mr. Phillips: Her notes, I would submit, are not a business record.

Ms. Johnson: I'm not reading from notes. I'm reading from this book. The Child Support Enforcement, we have to contact them through . . . email. We can't go to their office. Ms. Rosa Sauls was the Child Support Enforcement person who sent me the email and it's documented in the file.

\* \* \*

The Court: I'll note your ongoing objection to hearsay and this one is overruled.

In our view, the email from Ms. Sauls was properly objected to as inadmissible hearsay. Notably, the email does not identify Ms. Sauls or her position. Nor does it appear that the email is properly construed as a "record" at all. It is simply the sender's interpretation of information she presumably gained from another, unidentified source. DCS relies on the email as its only evidence that Mother and Father willfully failed to support the Children. At trial, the details regarding the dates and amounts were not clear, but both parents certainly testified that they had made some child support payments in the months after the Children were removed and before the petition was filed, and thereafter. Both testified to brief periods of employment when, they asserted, support payments were deducted from their checks. Father further testified that a tax refund he received was applied to child support.

The parents' testimony concerning payments of child support is uncorroborated. As we earlier noted, however, each alleged ground for termination must be proven by clear and convincing evidence. In this regard, DCS has the burden of proof. Having concluded that the email is inadmissible hearsay, we must further conclude that there is no evidence to support the trial court's finding that Mother and Father abandoned the Children by willfully

failing to provide child support. Accordingly, the finding of abandonment by non-support is hereby reversed as to both Mother and Father. We now move to the remaining grounds for termination, mindful that only a single ground must be proved by clear and convincing evidence to justify termination. ***In re Audrey S***., 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

V.

A.

The trial court found that both parents abandoned the Children by failing to visit them, by engaging in conduct evincing a wanton disregard for their welfare, and by failing to provide them with a suitable home. Tenn. Code Ann. § 36-1-113(g)(1) (2010) provides that termination can be based upon a showing that "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred…." Tenn. Code Ann. § 36-1-102 (2010) defines forms of abandonment, as relevant in the present case, as follows:

> (ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

*   *   *

-11-

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(ii), (iv). "Willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. "[T]oken visitation" means that "the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(C), (E).

B.

In the present case, the trial court found that both parents willfully failed to visit the Children. We consider this ground with respect to each parent.

Mother was in jail during part of the four-month period before the petition was filed. Accordingly, as to her, the relevant time period for establishing abandonment by failure to visit the Children is the four-month period before she was incarcerated – June 4, 2011 until October 4, 2011. The trial court found that Mother was aware of her obligation to visit the Children because DCS repeatedly informed her of this obligation at child and family team meetings. Furthermore, it was required in the permanency plan she signed. The trial court further found:

In the four months before [Mother] went to jail, she willfully failed to visit the [C]hildren, although she was able to visit, and the visitation[s] she kept were token in nature as she was intoxicated, verbally abusive, and inappropriate with the [C]hildren; she brought inappropriate persons to the visits; she knew the [C]hildren were in DCS custody, and there was no court order or any other impediment to visitation. From

-12-

December 2010 until November 2011[,] [Mother] attended
sixteen . . . visits and missed thirty one . . . visits.

Both parents testified they were aware of their obligations toward the Children as set forth in the permanency plans and court orders.  They also acknowledged that they had received the criteria for termination.  At trial, Mother testified that she visited whenever she was able.  Again, during 2011, Mother appeared for only 16 of 52 scheduled visits.  During March and April, Mother repeatedly cancelled visits or they were ended early.  In the months before the petition was filed, the parents were permitted 2 hours of supervised visits a week, and they were allowed to attend the Children's appointments, go to school meetings, and contact the Children in writing or by phone.  Grandmother was allowed overnight visitation every weekend and she supervised many of the parents' visits.  She said Mother, and Father, when he was not in jail, visited "many more  times" than they missed.  She said the parents showed "excellent parenting skills" and the Children were "very happy" during visits.  Other witnesses, however, testified to the contrary.

During the critical period, the supervising staff reported that Mother did not do well at the visits – she was "mad. . . , acting out of sorts," yelled, and more than once brought a different male companion with her.  It was noted that "little or no progress [was] made with Mother."  During July 2011, Mother was a no-show for one visit and another time arrived unscheduled at Grandmother's house with a male companion.  By then, DCS had informed Mother that it would no longer pay for therapeutic visitation services because she was not making progress and the schedule was not being kept.  Mother did not dispute that she missed visits; she testified only that she visited the Children "every chance [she] got. . . . "
She gave no reason for missing the majority of the visits during 2011 other than being in a car wreck in March and having to rely on others for transportation.  The case manager testified to her continued view that Mother exercised only token visitation – visits that were not appropriate due to Mother's behavior.

Father was incarcerated from December 2010 until March 7, 2011, when he was released on bond.  Father violated his probation and was incarcerated again from May 17, 2011 until October 11, 2011.  Consequently, the relevant four-month period for Father begins January 16, 2011 and ends May 16, 2011.  Again, the trial court found that, like Mother, Father was aware of his obligations pursuant to the permanency plan and meetings with, and information repeatedly provided to him by, the DCS case manager.  Father was admittedly provided a visitation schedule and notified, at least six times, of the consequences of his failure to exercise his visitation rights during the four month period.  The court found that Father "willfully failed to visit the [C]hildren, although he was able to visit, and the visitation he kept was token in nature as he was inappropriate with the [C]hildren, and became physically aggressive."  He testified that in the two months that he was on bond, he appeared

at every weekly visit with the Children. Because he was incarcerated before and after those two months, he was unable to visit the Children again until after his release in October 2011, months after the four-month period had passed.

The trial court accurately summarized and properly considered the proof presented at trial. The evidence supports the trial court's finding of abandonment by failure to visit. Although the proof does show that Father consistently visited the Children for the limited time that he was out on bond from March to May 2011, he then violated the terms of his probation and was returned to jail for the next 270 days. His actions prevented him from exercising regular visits with the Children both leading into and during the critical period. We agree with the trial court that the few visits Father was able to exercise are properly considered token visitation. Similarly, the trial court considered the number and quality of the visits Mother had and appropriately concluded they were also token in nature. By the time of trial, both parents remained subject to an order that prohibited contact with the Children so that they had had no contact with the Children in some eight months.

The evidence does not preponderate against the trial court's finding that Mother and Father willfully failed to visit the Children. The trial court properly terminated their rights on the ground of abandonment by willful failure to visit.

C.

The trial court found that Mother and Father also abandoned the Children by failing to provide them with a suitable home in the four months following the Children's removal – from December 19, 2010 until April 19, 2011 – despite reasonable efforts by DCS to assist them. In its order, the trial court detailed a lengthy list of the various resources, referrals, and services provided by DCS in an effort to help Mother and Father "get on their feet" and improve their circumstances so that they could provide a suitable home for the Children. At the other end of the spectrum, the trial court set out the parents' lack of action and progress in this area. Among its findings, the court stated:

> [Mother and Father] have made no reasonable efforts to provide a suitable home or improve their personal conditions. Instead, they have remained homeless and/or incarcerated.
>
> [They] continued to have criminal charges, engage in criminal activity, and remain on probation.
>
> [They] have not secured safe stable housing or any type of permanent residence.

[Mother] has lived at at least five different locations during the time the [C]hildren were in custody, none of which were in her name nor did she pay rent.

[Father] was incarcerated for long periods of time and when he was not in jail he testified that he was homeless and jobless and paid no support, but . . . at the same time he was splitting rent with his sister and working on Clifford Seal's farm for minimum wage.

The case worker from MATS Homeless Shelter testified that as long as the people who stay there follow the rules and attempt to find work there is no time limit on . . . [their] stay at the shelter.

[Mother] stayed at MATS for . . . eight to nine days and then went back to jail. Upon her release from jail she attempted to stay at MATS once again but was unable to do so because she failed a drug screen upon admission.

[Mother and Father] did not avail themselves of the housing lists and efforts made by DCS to assist them in establishing a suitable home.

[Mother and Father] have not shown that they have any means to financially support themselves or the [C]hildren if they were to regain custody, therefore putting the [C]hildren's safety at risk.

[Mother and Father] have not availed themselves of the therapeutic visitation services to assist them in dealing with the [C]hildren and building a positive relationship with [them].

[Mother] did not participate in a hair follicle . . . drug screen, or . . . drug rehabilitation to prove that she was drug free and could care for her children in a safe, sober, and proper fashion.

In summary, the trial court found as follows:

[T]he testimony and exhibits are replete with evidence of DCS's efforts to assist [Mother and Father] in finding stable homes and employment, and that [Mother and Father] made no reasonable efforts to do the same.

[Mother's and Father's] failure to make even minimal efforts to improve their home and/or personal condition demonstrates a lack of concern for their children to such a degree that it appears unlikely that they will be able to provide a suitable home for the [C]hildren at an early date.

The proof shows that both parents were approved to stay at a shelter that provided residents with counseling, employment assistance, food, clothing and shelter. Although the case manager conceded that the shelter itself would not be deemed suitable permanent housing, staying there would have allowed Mother and Father to be supported while they made efforts to find jobs and work on their personal issues. In turn, they could have started saving money to apply toward suitable, permanent housing of their own. Father was approved for the shelter in October 2011, but decided instead to live with his sister, with whom he shared rent. Mother checked into the shelter for roughly a week in September 2011, but a drug test indicated she was taking Suboxone and she was not allowed to reenter the shelter on her release from jail the following month.

Ms. Johnson also provided the parents with a list of all available housing in a three-county area with contact information and personally delivered an application for public housing to them. She continuously updated the information she provided. Although Ms. Johnson had personal contacts for an apartment complex in Sneedville, Mother informed her that under "no conditions would she live in apartments in Sneedville." Instead, Mother, and Father, when he was not in jail, moved around, lived with different people, lived in a motel room and were at times homeless. In the ten child & family team meetings that DCS held in a 12-month period, housing and other requirements of the permanency plan were reviewed, but the parents never obtained suitable housing.

In short, the proof established, and both parents essentially conceded, that they did not obtain a safe, stable place for the Children in the year after DCS was granted custody of the Children. Mother testified that she lost housing because she could not pay rent or was in jail, and that she was homeless for a while. She admitted that she did not have suitable housing until after the petition was filed. She explained that before then, she kept getting arrested for public drunkenness and failure to appear in court because, she reasoned, "it's pretty hard to focus" when one's whole life is disrupted. Mother and Father insisted, without any supporting evidence, that by 2012, they had secured a suitable home for the Children.

-16-

The evidence does not preponderate against the trial court's findings. The trial court properly terminated both Mother's and Father's rights on the ground of abandonment by failure to provide a suitable home for the Children.

D.

Lastly, regarding the ground of abandonment, the trial court found that both parents engaged in conduct prior to their incarceration that evidenced a wanton disregard for the Children's welfare. The court found, based on DCS reports, that Mother had appeared at DCS for meetings in an obviously intoxicated state on some nine occasions during 2011. On this point, the trial court expressly credited the testimony of the case manager, while it found Mother's testimony not to be credible. During this time, she also admitted to taking narcotic pain pills and to using Suboxone which allowed her to pass drug screens. Further, the proof showed that before the Children were removed, Joseph missed 19 days in his first year of school, Mother failed to maintain contact with DCS, and continued to engage in criminal activity. Mother's criminal history dates back to 2007 when she failed to appear in court. She was arrested for assault in June 2009, for public intoxication in 2010, and several times thereafter for failure to appear in court. Mother said she was unable to drink alcohol since she suffered liver injuries in the car accident and said she had not used drugs since August 2011. Nonetheless, she was arrested for public intoxication on September 1, 2011 and admitted to having taken Lyrica at the time. On August 23, 2011 and again on October 14, 2011, she was arrested for public intoxication. In July 2012, Mother was charged with smuggling narcotics into jail. At the time of trial, Mother had another charge of failure to appear pending. Grandmother testified that Mother experienced a substance abuse problem at the time the Children were removed and into the summer of 2011. She suggested Mother get help with her drug issues, but conceded Mother never went for treatment.

The court found that Father also showed a wanton disregard for the Children's welfare. The court noted (1) Father's arrest for a domestic assault against mother and a conviction for assault against a child, both in 2009, and (2) his 2010 arrests for violation of probation and failure to appear. Looking back to 2005, when the first child was born, Father was arrested for driving under the influence, second offense. In 2007, he was arrested for violating his probation and driving on a revoked license, and in 2008, for failure to appear and escape. As with Mother, the court noted Father's "ongoing criminal activity, and continued incarcerations during this custody episode." Lastly, the court observed that Father's "criminal record . . . shows a significant amount of time in jail and one cannot effectively parent if one is incarcerated." Father expressly conceded that his multiple incarcerations since the Children were born exhibited a wanton disregard for the Children.

He insisted that he was irresponsible before, but had changed for the better since losing the Children.

This Court has held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and failure to provide adequate support or supervision for a child can, alone, or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S*., 182 S.W.3d at 867-68. All of these factors are present in the instant case with respect to Mother or Father or both. Consequently, we conclude that the evidence does not preponderate against the trial court's finding that the parents acted in wanton disregard for the Children's welfare.

VI.

The trial court terminated both parents' rights for being in substantial noncompliance with the family's permanency plan. *See* Tenn. Code Ann. §36-1-113(g)(2). The court found that the goals of the initial and revised plan were appropriate and the responsibilities for Mother and Father were reasonably related to remedying the conditions that necessitated the Children's removal. This finding is not in dispute.

As earlier discussed, the plan required the parents to address the problems they had demonstrated in the areas of: (1) domestic violence, (2) alcohol and drug abuse, (3) parenting, and (4) housing. Further, they were tasked with completing therapeutic visitations with the Children and providing them with child support. The trial court found that both parents failed to satisfy the majority of the plan's requirements in that neither completed a hair follicle drug screen, an anger management course, or followed recommendations of a parenting assessment; they did not cooperate with therapeutic visitation services or attend the Children's appointments; they did not maintain a home free of illegal activity and drug use; and they did not maintain suitable housing for a period of six months. The court further found that Mother did not complete an alcohol and drug assessment despite multiple convictions for public intoxication and did not maintain her sobriety or present herself to DCS or the Children in a sober fashion.

The proof showed that, a year after the Children were placed in foster care, the parents had demonstrated little to no progress in completing the specific "action steps" outlined in the plan. As to Mother, she explained that she did not complete an alcohol and drug assessment because it required her to admit she had a drug problem and she refused to do so. As a result, she never obtained treatment for her substance abuse problem, seemingly her most significant obstacle to regaining custody of the Children. Instead, after the Children were removed, Mother continued to incur new criminal charges, often related to her substance abuse. As for Father, he testified he was aware of the plan requirements and had

"plenty of time," but was unable to get anything done while his driver's license remained suspended. Although both parents testified that by 2012, they had established housing and found some work, they provided nothing to support their claims. Any efforts to comply with the permanency plan came long after the Children had entered foster care and not until the termination proceedings had begun.

In summary, the proof preponderates overwhelmingly in favor of the trial court's finding that Mother and Father failed to comply substantially with the terms of the permanency plan. Based on the foregoing, the trial court did not err in terminating the parents' rights based on the ground of their substantial noncompliance with the permanency plan.

## VII.

The trial court terminated the parents' rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3)(A) - (C). That section provides for termination when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> ( A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

With respect to this ground, the trial court found as follows:

> DCS removed the [C]hildren from their home because of lack of supervision, drug exposure, domestic violence, criminal activity, and failure to comply with a non-custodial permanency plan.

The conditions that led to the removal still persist in that the Mother continues to abuse narcotics to the extent she is unable to properly parent or care for her children. The Mother and Father continue to be involved in criminal activity, resulting in the Mother's repeated incarceration and the Father's lengthy incarceration.

Other conditions in the home exist that, in all reasonable probability, would lead to further neglect or abuse of the [C]hildren in that the parents do not have housing, do not have the ability to provide a safe and stable home; they continue on probation and the [M]other has new criminal charges; they have not completed the tasks on the permanency plan; they are without a legal source of income; they are without proper transportation; and they are unable to maintain visitation and do not behave accordingly during what visitation they do attend; and they have not paid support.

The Court finds that there is little chance that those conditions will be remedied soon so that the [C]hildren can be returned safely to the home because, for the life of this case, DCS made reasonable efforts to help [Mother and Father] remedy those conditions, to no avail, and [Mother and Father] have made no reasonable efforts to remedy the reasons the [C]hildren came into care.

The proof at trial showed that in the year after they were placed in DCS custody, the Children were moved to three different foster homes as a result of their behavior problems. Finally, they settled into their current home. During the same period of time, Mother and Father were afforded a chance to remedy the conditions that led to their losing custody of the Children. Fully aware of the tasks they needed to complete and armed with the assistance provided by DCS and other entities, Mother and Father could have "worked the plan" in an effort to regain custody. Instead, they continued their old ways – Mother turned to alcohol and drugs, while Father continued to violate the law and return to jail. Neither made any apparent efforts to obtain a steady income or stable housing, or to address their personal circumstances. Not until the petition was filed and the real possibility of termination loomed did Mother or Father take any steps in the right direction. Even then, the court had only their word and nothing more to corroborate their assertion that they were both working for the past few months, had a suitable home, and had the ability to properly care for and parent the Children.

This Court has observed:

> Where, as here, efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified. The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child."

*In re Pauline M*., No. E2009-02649-COA-R3-PT, 2010 WL 4515062 at *9 (Tenn. Ct. App. M.S., filed Nov. 10, 2010) (internal citations omitted).

In the present case, the court concluded that the Children deserve a chance at life in the type of "safe and caring environment" that their parents failed to provide. We agree. In our view, DCS clearly and convincingly proved the ground for termination based on persistence of conditions as to both parents. We therefore affirm the trial court's finding.

VIII.

"The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Once grounds for termination have been found, the focus of the proceedings shifts to the best interest of the child. *Id*. Having concluded that the trial court properly terminated both parents' rights in the case at bar, we next consider whether the decision is in the Children's best interest. We are guided in our review by the relevant statutory factors set forth in Tenn. Code Ann. § 36-1-113(c).[3]

---

[3]The factors are as follows:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear

(continued...)

-21-

In the present case, the trial court expressly analyzed the statutory factors and arrived at the conclusion that granting the petition to terminate was in the best interest of the Children. Of the nine factors, the court found that all of them weighed in favor of permanently severing both Mother's and Father's ties to the Children. Among its findings, the court noted that neither parent had changed their conduct or circumstances to the point that the Children could be returned safely to their care, and they had not made the necessary efforts to remedy the conditions that led to the Children's removal. The court noted that lasting change did not appear possible in the near future. The court further found that neither parent had consistently maintained contact with the Children. The court found that because both parents failed to address their personal issues, it was "highly likely" that the related

_____

[3](...continued)
     possible;

     (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

     (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

     (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

     (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

     (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

     (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

     (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

problems would continue, thereby rendering the parents unable to care for the Children. Finally, the court noted that the only meaningful parent/child relationship was evidenced by the strong bond the Children and their foster parents had developed in "the only safe and stable home the [C]hildren had ever known."

At trial, foster mother testified that, at first, the Children exhibited "really bad" behavior. Joseph was violent toward his sister and said he wanted her dead, so the two had to be kept separated. Trinity had similarly aggressive behavior. She began to improve after attending a 15-week program at a child advocacy center. The foster parents instituted structure and discipline using "timeouts" and rewards at home, and the Children underwent "considerable" professional therapy. At the time of trial, the siblings had normal relationships with each other. Although Joseph was diagnosed with attention deficit disorder, he was taking prescribed medication and doing well in school. Foster mother said the parents had called the Children a total of two or three times before contact was discontinued. Mother sent two letters to the Children, but no gifts or clothing. Foster mother reported that the Children were often angry and their behavior deteriorated after periods of visitation. They reported at each visit Mother would tell them they were coming back "home" in a month. She also told Joseph he was being turned into a "meth addict" and didn't need to take the medications his doctor had prescribed. According to foster mother, the Children did not ask about Mother and Father after the visits were ended some eight months earlier. The Children were doing well and the foster parents were "strongly" considering adopting all three of them if they became available.

In short, while the trial court credited Mother and Father with "doing better" in some aspects by the time of trial, the court concluded that, when properly viewed from the Children's perspective, consideration of the Children's best interest clearly and convincingly shows that Mother's and Father's ties should be permanently severed. On our considered review of the record, the evidence does not preponderate against the trial court's findings in support of its decision.

IX.

The judgment of the trial court is affirmed with the exception that the finding of abandonment by willful failure to support is reversed as to both Mother and Father. In all other respects, the judgment is affirmed. Costs on appeal are taxed to the appellants, E.G. and J.G. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE